(No. 21534.—

THE OLD BEN COAL CORPORATION, Plaintiff in Error, *vs.*
THE INDUSTRIAL COMMISSION *et al.*—(JOHN GOURNEY,
Defendant in Error.)

*Opinion filed February 23, 1933—Rehearing denied April 5, 1933.*

ANGERSTEIN, PIGGOTT & ANGERSTEIN, (THOMAS C.
ANGERSTEIN, and GEORGE W. ANGERSTEIN, of counsel,) for
plaintiff in error.

B. W. EOVALDI, and GEORGE W. DOWELL, for defend-
ant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

On March 15, 1928, defendant in error, John Gourney,
(to whom we will herein refer as the employee,) while in
the employ of plaintiff in error, the Old Ben Coal Corpo-
ration, (herein referred to as the employer,) received an
accidental injury arising out of and in the course of his
employment. On August 31, 1928, the employee filed with
the Industrial Commission an application for adjustment of
his claim for compensation. The hearing on the petition
was continued from time to time until June, 1930, when

a hearing was had before an arbitrator, who on June 16, 1930, entered an award in favor of the employee for $14 a week for 37 weeks for temporary total disability. On the petition of the employee the case was reviewed by the Industrial Commission, which on October 20, 1931, confirmed the award of the arbitrator for temporary total disability and made a further award to the employee of $14 a week for 230-6/7 weeks and thereafter a pension for life of $300 a year, payable $25 a month, for permanent and complete disability. A writ of *certiorari* was issued by the circuit court of Franklin county for a review of the record, and that court confirmed the award of the Industrial Commission. This court has granted a writ of error for a further review of the record.

The employee at the hearing before the arbitrator in June, 1930, testified substantially as follows: He was then forty-nine years of age. On March 15, 1928, he was working in a mine of the employer in an "old place," cleaning it up for drilling. He had started to load "bug dust" into cars when the top and face of the mine caved in. He was hit on the back, head and shoulders and knocked down. When he tried to get up more coal fell and covered him up and he lost consciousness. After he was taken out of the mine and had regained consciousness he was taken to the office of Dr. Sheerer, the employer's physician, in Christopher. He walked up the steps to the office, which was on the second floor, with some assistance from the man who accompanied him. After some attention from the doctor he was taken to a hospital in DuQuoin and remained there under the care of Dr. Sheerer for about three weeks. The mine at which he had worked closed down about two weeks after he was injured. He worked in the mine several days in December, 1928, and one day in January, 1929, but was only able to load from one and a half to two tons of coal a day. When he stooped over he suffered pain and

spit blood. On the last day he worked he tried to lift some props and suffered such pain in the lumbar region of his back that he had to lie down for a while. He has not worked since that time and has not been able to work any because he felt so bad and weak. When he stoops down he is unable to straighten up, and any movement of the trunk of his body is accompanied by pain. Prior to the injury of March 15, 1928, he had never had any injury to his back, head or shoulders but had injured his leg a little bit at one time. He is of Polish extraction, has been in this country about twenty-five years and had worked for the employer since 1923. At the hearing before the commission on May 13, 1931, he testified, over the objection of the employer, that his condition had not improved any since the hearing before the arbitrator.

The record in this case shows that the employee worked a total of forty-two days during the last three months of 1927 and loaded during that time a total of 410 tons of coal, an average of 9.7619 tons a day. During the first three months of 1928 he worked a total of forty-seven days and loaded a total of 446 tons of coal, an average of 9.4893 tons a day. In December, 1928, after he was injured, he worked nine days and loaded 16 tons. In January, 1929, he worked one day and loaded two tons—an average of 1.8 tons a day.

Six physicians testified for the employee in substance as follows:

Dr. J. E. Williams: He was for four years in charge of the West Frankfort Union Hospital. He examined the employee on April 23, 1928, on September 21, 1928, and several times thereafter. On the first date he made an X-ray picture and on February 20, 1930, four X-ray pictures of his back. These pictures showed a marked curvature of the spine. The upper dorsal, upper lumbar and lower dorsal vertebræ curved to the right possibly two inches. There was considerable narrowing of the left side

of the bodies of the tenth, eleventh and twelfth dorsal vertebræ and some narrowing on the left side, with "spur formation," of the first dorsal vertebra. A picture of the lumbar spine showed decided curvature to the right and a crushing fracture of the right side of the fifth lumbar vertebra. There was "spur formation," or deposit of bone, on the first, second and third lumbar vertebræ. Such formation is very common in men of employee's age and was probably there before the injury. One of the pictures also showed a fracture of the third rib on the right side, an inch and a half from the spine. The condition of the spine, as shown by the pictures, will make it impossible for the employee to do normal labor and the condition will be permanent. The condition of the spine could be due to coal having fallen on the employee and hurting him and was such that it could cause pain to him on bending over or lifting. The fact that the spine was out of line would cause unnatural pressure on the inter-vertebral discs and impingement on the nerve roots, which would cause pain that might radiate to any part of the body and legs. Many things cause curvature of the spine. Many people are born with such curvature and go through life with it and work. A part of the curvature of the spine in the employee's case existed before the injury. Witness never saw a back as crooked as was the employee's caused by a fracture of any one vertebra. The showing of the picture as to the fractured rib was such as would be expected in case of recovery from a fractured rib. The picture made in February, 1930, showed more bone thrown out around the fifth lumbar vertebra than was shown in the picture made in April, 1928.

Dr. Andrew B. Jones, of St. Louis, Missouri, specializing in nervous and mental diseases: He testified before the arbitrator. He examined the employee three times—first in the latter part of August or first part of September, 1928, and then on April 16 and May 29, 1930. In his opinion the employee was unable to do manual labor because

of a spinal fracture, pain from that fracture, and hysteria. The compression fracture of the employee's vertebra is a permanent injury. In answer to a hypothetical question witness stated that if the employee had a curvature of the spine before the injury, or which was partly caused by the injury in which the employee received a crushing fracture of the fifth lumbar vertebra, the condition of the spine after the injury would account for the pain of which he complained and for his inability to work. The fracture of the fifth lumbar vertebra would not account for pain in the shoulders and chest without a further curvature of the spine, which would cause trouble with the nerves leading to those parts of the body. The impingement of the nerves, if any, by the fracture of the spine was not sufficient to interfere with the ascending and descending muscles or to cause any paralysis. The employee had no limitation of motion of the legs, hips, arms or upper part of the back but did have a limitation in all directions in the movement of the lower part of the back. If the injury caused any impingement of the sacral nerve it would have caused pain immediately. All of his reflexes were substantially normal. There was some change in sensation in one-half the body, but witness took that to be a "so-called hysterical thing." He noticed no change in the employee's condition between witness' first and last examination of him.

Dr. Sherwood Moore: He is a physician and radiologist for the Barnes Hospital, the St. Louis Children's Hospital, the St. Louis Maternity Hospital, the MacMillan Eye, Ear, Nose and Throat Hospital, the Washington University Dispensary, and the Shriner's Hospital for Crippled Children, of St. Louis, Missouri. He made an X-ray examination of the employee's back in August, 1928, in April, 1930, and in June, 1930. The X-ray picture made in August, 1928, showed that the lumbar spine rotated to the right. There was a scoliosis, with convexity to the right, most pronounced at the first lumbar vertebra. There was

hypertrophic osteoarthritis involving the first, second and third lumbar vertebræ. The appearance of the second lumbar vertebra indicated that it had been crushed on its left side, and in addition to being rotated it was dislocated to the right on the third lumbar vertebra. The condition of the spine shown by the pictures would be due to fracture. In his opinion the injury was received months before the pictures were taken. The scoliosis to the right, chiefly at the first lumbar vertebra, was, in his opinion, of congenital origin. The X-ray pictures made in April, 1930, showed a decreased dimension on the right side of the body of the fifth lumbar vertebra between a quarter and half an inch and a decreased vertical dimension on the left side of the second lumbar vertebra. The appearance of these vertebræ would indicate that they had been crushed. These pictures also showed a rotation to the right of the body of the fourth lumbar vertebra and hypertrophic osteoarthritis of the first, second and third lumbar vertebræ. Witness had never seen a case where there was a variation of over a quarter of an inch in the vertical dimensions of the sides of a vertebra that was congenital or caused by occupation. Witness had taken a car-load of X-ray pictures where there was a marked scoliosis of congenital origin, but in no case were variations in the vertical measurements of the sides of the vertebræ found. The curvature in such cases was due to variations in the inter-vertebral spaces. Because of the sponge-like character of a vertebra there could be a compression of one side of it of upward of a quarter of an inch without a breaking off of parts or a bulging out of the sides. In an X-ray picture of a compression fracture, taken immediately after the injury, there might be a showing of the fracture line, and there would be a showing of an altered relationship between adjacent bony parts. A picture taken after some time would show an altered texture and a greater density of the injured part of the bone and an outgrowth or spurs of bone around the mar-

gins of the vertebra, which would not be distinguishable from the condition described as hypertrophic osteoarthritis. If there was no different showing in a picture taken immediately after the injury and one taken months later, then the injury could not have caused the condition.

Dr. Theodore G. Brooks, of St. Louis, Missouri, at the hearing on review: He saw and examined the employee for treatment the first time on August 1, 1928. Thereafter he saw him on nineteen different days. His last examination of the employee was on March 4, 1931. On his first examination he found that he had a right scoliosis of the dorsal lumbar region at the junction of the dorsal spine with the lumbar spine, with limitation of back motions in all directions and marked spasm of the muscles along the spine on either side. The findings of subsequent examinations were substantially the same, with the exception that there seemed to have been some increase in the rotation of the spine. In August, 1928, the employee was given a back splint, commonly called "Osgood plate." July 1, 1930, he was splinted by chin traction in an effort to straighten out the spine, and a plaster jacket was applied. This jacket remained until August 12, 1930. On August 22, 1930, he was given a celluloid jacket. Witness recommended that he have a fusion operation of his spine, but no such operation had been performed. From the clinical appearance of the employee, the report of the X-ray man and witness' observation of the X-ray films, his diagnosis was a compression fracture of the fifth lumbar vertebra, an injury to the second lumbar vertebra, a compensatory scoliosis and hypertrophic arthritis. In his opinion the compression fracture of the fifth lumbar vertebra was caused by trauma of some sort. In his opinion the injury was an old one that had occurred several weeks or a few months prior to the time he first examined the employee. His pathological condition was permanent, but there could be some relief in the symptoms either by an operative fusion of his spine or the

wearing of a jacket. In his opinion the curvature or scoliosis of the spine above the fifth lumbar vertebra was largely of a compensatory nature. If the scoliosis of the spine above the fifth lumbar vertebra was caused by a compensation for the variance in the vertical dimensions of the sides of that vertebra caused by injury, then the scoliosis would not assume a permanent condition for weeks and months after the injury, and if an X-ray picture taken the day after the accidental injury showed the same condition of the spine as was shown by X-ray pictures taken months afterward, then it would be impossible to say the condition of the spine was caused by the accidental injury. Witness had never seen, and did not know of anyone else having seen, a congenital condition of a fifth lumbar vertebra which was like the condition of that vertebra in the employee's case. A compression fracture of a lumbar vertebra is usually of the first or second lumbar vertebra, and when there is a compression fracture of the fifth lumbar vertebra it is more usually a forward rather than a lateral compression. When there is a lateral compression fracture of a lumbar vertebra of upward of a quarter of an inch there is often immediate pain and a gradual collapse, but there is nothing more variable in orthopedic practice than traumatic back injuries. In some cases there is grave and immediate disability, and other patients "hang on indefinitely before they give in to such an injury." Most of the nerve trunks emerge from the spine above the fifth lumbar vertebra, but any disability in that area gives pain, and the pain is frequently progressive, as scarring develops and broken or torn tissues unite. In response to a hypothetical question reciting the facts in the record concerning the accidental injury and subsequent history of the employee's case, witness stated that he believed the injury could have caused the employee's disability. Objections of the employer's attorney to questions asking witness' opinion as to the employee's ability to do manual labor and whether or not

such condition would cause him to suffer pain on movement were sustained.

Dr. O. L. Rutherford, at the hearing on review: He first examined the employee in May, 1929, and also examined him at various dates thereafter. At the time of the first examination he made X-ray pictures of the back. One of these pictures showed a compressed fracture between the first and second and between the fourth and fifth lumbar vertebræ, with the greatest degree of fracture on the fifth vertebra. The other picture of the dorsal region showed a fracture of the second rib on the right side. He never noted any improvement in the employee's condition. In his opinion he is unable to do manual labor. There was no prospect of improvement in his condition, and the condition was due to the fracture of the rib and the injury to the first, second and fifth lumbar vertebræ.

Dr. Frederick Greenbaum, at the hearing on review: He first examined the employee on October 12, 1929. He was fairly well nourished. He was slightly stooped and resisted any attempt to straighten him up. His reflexes were normal and organs perfectly all right. When witness ran his finger down his spine he noticed that there was scoliosis to the right of the lumbar spine, with a left compensatory curvature of the thoracic spine. X-ray pictures showed marked arthritic changes of the second and third thoracic, eleventh and twelfth dorsal and first and second lumbar vertebræ, and also showed a compression fracture of the fifth lumbar vertebra. There was a disalignment of the body of the spine, due to the lateral curvatures. It would have been possible for him to have sustained the fracture of the fifth lumbar vertebra that witness found without there being any bruises or fractures on the outside of the body in the immediate vicinity, and it would also have been possible for him, shortly after the fracture, to have walked up a flight of steps to a doctor's office. In witness' opinion he could not very well perform any manual labor that involved

the use of the lower segments of the spine. His condition is permanent, and is due not to the scoliosis of the spine but to the fracture of the fifth lumbar vertebra. The fracture of that vertebra could have been caused by coal falling on the shoulders and back of the employee.

The following six physicians testified for the employer before the arbitrator:

Dr. W. W. Sheerer, who took care of men injured in the employer's mine: His office is at least a mile from the mine in which the employee was injured and is on the second floor. The employee walked into witness' office on March 15, 1928, without any assistance. He had a scalp wound and some slight bruises on his back. He made no complaint of his back. His chief complaint was of the cut on his head. Witness stripped him and looked at his back. He had a very pronounced curvature of the spine, which was so great that it could be seen without an X-ray and was obvious to a layman. The slight bruises on his back required no treatment. Witness sent him to a hospital at DuQuoin. Two X-ray pictures of his back were taken the next day. These pictures showed the curvature or scoliosis of the spine. They did not show any fracture of the fifth lumbar vertebra. They showed a thinning out or compression on the right side of that vertebra, such as is the usual case where there is scoliosis of the spine. There was no appearance of any recent compression fracture of the fifth lumbar vertebra, and witness' opinion was that the curvature was of long standing. X-ray pictures taken on April 13, 1928, showed the same condition of the spine as shown by the pictures taken the day after the injury and did not show any fracture of the fifth lumbar vertebra. He was discharged from the hospital for work on June 1, 1928. In witness' opinion he could work the same as he did before the injury. To work might cause him pain, but he worked with the same condition before the injury. It would have been impossible for the injury by the falling coal to have

caused the condition of his spine that witness found on his first examination of him.

Dr. C. S. Lausch, an adjuster in the employer's compensation department, testified that he was in Dr. Sheerer's office when the employee was examined on the day of the injury; that the doctor called witness' attention to the curvature of the employee's spine, and he noticed it, and that there were a couple of small bruises or skinned places on the employee's back.

Dr. J. B. Moore, Dr. J. A. McGregor, Dr. L. V. Gates and Dr. I. T. Roberts: All of them had examined the employee and the X-ray pictures of his spine. They stated that there was no fracture of the fifth lumbar or any other vertebra of the employee's spine; that the curvature of his spine was of long standing and was probably congenital and caused by the deformity of the fifth lumbar vertebra, and that there was no condition of the employee's back caused by trauma that would incapacitate him from doing the same kind and amount of work he did before March 15, 1928, the date of his injury.

The only evidence for the employer at the hearing on review was the evidence of Dr. J. B. Moore, to the effect that there was no difference in the showing as to the condition of the employee's fifth lumbar vertebra in the X-ray pictures made on March 16, 1928, August 1, 1928, and April 16, 1930.

At the conclusion of the hearing on review the Industrial Commission submitted all the X-ray pictures introduced in evidence to its medical director, with directions to him to make a report of his findings therefrom as to whether or not there were fractures of the employee's spine occurring on March 15, 1928. His report is, in part, as follows: "From the X-ray plates alone, with nothing else to go by, it is my opinion that there is no evidence of a compression fracture of the second lumbar or of the third lumbar vertebra, but that there is a narrowing or reduc-

tion of thickness of the lateral portion of the right side
of the fifth lumbar vertebra. The origin of this cannot
be determined. It runs consistently through the entire se-
ries of films. It could be an old Kuemmell's disease, a
congenital deformity, or a pathological change within the
bone of the vertebra, or it could be a compression frac-
ture. From the X-rays of March 16, 1928, or any of the
other films, the probable date of the fracture cannot be
determined."

It is the contention of plaintiff in error that the evi-
dence does not establish that the employee is permanently
and totally disabled, or that his disability, if any, was
caused by the accidental injury of March 15, 1928. The
evidence conclusively shows that before the injury he was
able to do a full day's work and did do hard manual labor.
The evidence of the employee was that the only time he
attempted to work after the injury, in December, 1928, and
January, 1929, he was unable to do much and suffered
great pain, and that since January, 1929, he has been un-
able to do any work. His testimony that he is disabled so
that he cannot work is supported by the testimony of repu-
table physicians who testified for him, and the testimony
of these physicians is also to the effect that his disability is
a permanent condition. The inference drawn by the In-
dustrial Commission that the disability of the employee was
the result of the accidental injury of March 15, 1928, is
not unreasonable under the evidence in this record. The
fact that his disability did not develop to total disability
until some time after the injury is not a fact that would
show that such disability was not caused by the injury, ac-
cording to the experience of medical men, as shown by the
testimony of Dr. Brooks. It is impossible to reconcile the
medical testimony given by the witnesses for the employee
and that given by the witnesses for the employer. The tes-
timony of the employee and of his witnesses supports the
conclusion of the Industrial Commission that he is totally

584

and permanently disabled as a result of the accidental injury of March 15, 1928. When this evidence is considered in connection with all the testimony for the employer it cannot be said that the finding of the Industrial Commission is clearly or palpably contrary to the weight of the evidence in the record. The law is that an award under the Compensation act cannot rest upon conjecture or surmise or upon a choice between two views equally compatible with the evidence, but it is also the law that it is the province of the Industrial Commission to draw reasonable inferences from evidentiary facts, and that the findings of the commission will not be set aside by the courts unless manifestly against the weight of the evidence in the record. *Rissman & Son v. Industrial Com.* 323 Ill. 459.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*